**UNITED STATES of America**

v.

**Lynn Spencer CONRAD, Defendant.**

**Case No. 1:11CR00042.**

United States District Court,
W.D. Virginia,
Abingdon Division.

Feb. 13, 2013.

Zachary T. Lee, Assistant United States Attorney, Abingdon, VA, for United States.

Randall C. Eads, Abingdon, VA, for Defendant.

## OPINION AND ORDER

JAMES P. JONES, District Judge.

In this criminal case, the defendant, charged with firearms offenses, has moved to suppress certain evidence seized by local police pursuant to a search warrant on the ground that the items seized exceeded the scope of the warrant. In addition, she has moved to dismiss the charges on the ground that they violate her rights under the Second Amendment. Following an evidentiary hearing, I will deny the motions for the reasons that follow.

### I

The defendant, Lynn Spencer Conrad, has been charged by indictment with possessing firearms while being an unlawful user of a controlled substance, 18 U.S.C.A. § 922(g)(3) (West 2000) (Count Two), disposing of firearms to a prohibited person, 18 U.S.C.A. § 922(d) (West 2000) (Count Three), and making a false statement in connection with the acquisition of a firearm, 18 U.S.C.A. § 922(a)(6) (West 2000) (Count Four).[1] Part of the government's evidence against her consists of firearms described in the Indictment. These firearms were seized by local law enforcement officers during execution of a search warrant. One of the firearms was seized from her home and the others were seized from a pickup truck parked nearby.

In her first motion, the defendant argues that evidence of these seized firearms should be suppressed as violative of her Fourth Amendment rights. She contends that the officers who conducted the search exceeded the scope of their warrant in that firearms were not identified in the warrant

as items to be searched for and that the pickup truck was not parked on the property described in the warrant.

A joint hearing was conducted on the motions, at which the court heard testimony from officers who conducted the search as well as the defendant and a neighbor. From the evidence presented at the hearing, I find the following facts:

1. On September 10, 2008, investigators from the Wythe County, Virginia, Sheriff's Office executed a search warrant at the home of the defendant and her husband, Samuel Robert Conrad III, located in a rural area of Wythe County. Mr. Conrad had been arrested the previous day in connection with the homicide of his sister-in-law, Iris Gregory. The warrant, issued by a state magistrate, authorized the officers to search the "house, curtilage, outbuildings and any vehicles" at the Conrads' address for "any blood, hair, tissue or other biological fluids," as well as "any burned clothing and cloth towels";

2. At the time the officers searched the Conrads' home, they did not yet know how Iris Gregory had been murdered because of the condition of her body;

3. At the same time, the officers were aware that Mr. Conrad had been arrested in 2005 and charged in this court with possessing firearms while being a convicted felon. A number of firearms had been seized from the property at that time. The officers were also aware that Mr. Conrad had been acquitted of those charges by reason of insanity. They were

---

1. She is also charged with conspiring to possess with the intent to distribute and distribute controlled substances (Count Five), but that charge is not involved in the present motions. Mrs. Conrad's husband, Samuel Robert Conrad III, was also charged in the Indictment, but has since pleaded guilty.

aware that the court had ordered that the seized firearms be returned to the Conrad family, with the condition that Mr. Conrad was not to possess firearms or reside in a home in which firearms were present. The officers were also aware that the court had instructed Mrs. Conrad not to give firearms to Mr. Conrad or to keep firearms at the home;

4. In the course of conducting the search, officers discovered a smoking device that contained methamphetamine residue on a couch in the home near to where Mrs. Conrad had been sitting. They also discovered a narcotic pill on her person. Eli Conrad ("Eli"), the defendant's juvenile son who was also a resident of the home, was found to be in possession of marijuana;

5. In the course of their search of the home, officers discovered a firearm on the defendant's bed, a Ruger Mini–14.223 caliber rifle, which they seized and which is one of the firearms described in the Indictment in this case;

6. While executing the warrant, officers also searched a blue Ford pickup truck. This truck had been purchased by Mr. Conrad and his niece Emily Gregory. It was primarily used by Eli and the Conrads' neighbor, Eddie Edwards, for hauling firewood. The keys were always left in the truck and its doors were kept unlocked. At the time of the search, the truck was parked about thirty feet from the rear of the Conrad's house on the opposite side of a dilapidated wire fence. There was a large gap in the fence between the truck and the house. There was a driveway on that side of the fence that was used to pull the truck off the highway. This driveway provided more convenient access to the Conrads' home than their regular driveway, which was very steep. Other than the Conrad home, the nearest home to the truck was about a quarter of a mile away where Eddie Edwards lived. While the officers did not know it, the fence marked the Conrad's property line so that at the time of the search, the truck was actually parked on Edwards' property;

7. While searching the truck, an officer discovered and seized two rifles, a Stevens Model 73, .22 caliber, and a Marlin Model 783, .22 caliber, also described in the Indictment in this case;

8. An officer present who also had participated in Mr. Conrad's 2005 arrest recognized two of the seized rifles to be the same guns police had seized in 2005 and that the court had instructed the defendant to remove from the property; and

9. The firearms the officers seized from the truck were kept there in order to allow the Conrads' neighbors to easily access them. All of these neighbors had access to the interior of the truck and the firearms.

### A

The defendant contends that the officers exceeded the scope of their warrant by searching the interior of the truck. The search warrant permitted the officers to search the house, curtilage, vehicles and outbuildings located at the Conrads' address. The warrant did not authorize a search of any other property. The truck, parked on a neighbor's property at the time of the search was, therefore, not within the scope of the permitted search. Moreover, Mrs. Conrad asserts that she

had a reasonable expectation of privacy in the truck such that her Fourth Amendment right to be free from unreasonable searches and seizures was violated when the police searched the truck without a proper warrant.

■ "[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). The Supreme Court has found this inquiry to incorporate two discrete questions. First, the court must consider whether the individual has exhibited a subjective expectation of privacy—that is, whether the "individual has shown that 'he seeks to preserve [something] as private.'" *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Second, the court must consider whether the individual's subjective expectation of privacy, when "viewed objectively, is 'justifiable' under the circumstances." *Smith*, 442 U.S. at 740, 99 S.Ct. 2577 (quoting *Katz*, 389 U.S. at 353, 88 S.Ct. 507). "[I]t must be objectively reasonable; in other words it must be an expectation 'that society is prepared to recognize as reasonable.'" *United States v. Bullard*, 645 F.3d 237, 242 (4th Cir. 2011) (quoting *Bond v. United States*, 529 U.S. 334, 338, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000)).

■ In this case, the defendant has failed to establish that she had even a subjective expectation of privacy in the truck. No evidence presented at the hearing suggested that Mrs. Conrad took any action to protect the truck or the objects therein as private. The doors to the truck were always unlocked and the key was always in the ignition. The primary users and drivers of the truck were Eli and the Conrads' neighbor, Mr. Edwards. No evidence was presented during the hearing showing that Mrs. Conrad ever used or even rode in the truck. Mrs. Conrad's primary use of the vehicle, to the extent she had one, appears to have been as a sort of community storage shed. Most of the neighborhood—at least seven individuals named at the hearing—could enter the truck. Given the level of access that so many people had to the interior of the truck, Mrs. Conrad cannot now argue that she reasonably expected any items stored in the truck to be private. *See Katz*, 389 U.S. at 351, 88 S.Ct. 507 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). Because I find the defendant did not have a legitimate expectation of privacy in the truck, I hold that her Fourth Amendment rights have not been violated and I decline to suppress the evidence discovered therein.

■ Moreover, even if the defendant were to have had a legitimate expectation of privacy in the truck, the police officers who conducted the search of the Conrad property searched the truck in good faith. "'The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right.... Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.'" *United States v. Leon*, 468 U.S. 897, 919, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (quoting *United States v. Peltier*, 422 U.S. 531, 539, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975)). "[T]he harsh sanction of exclusion should not be applied to deter objectively reasonable law enforcement activity." *Davis v. United States*, —— U.S. ——, 131 S.Ct. 2419, 2429, 180 L.Ed.2d 285 (2011)

(internal quotation marks and citation omitted).

In this case, the police obtained a warrant, supported by probable cause, to search the Conrads' home, outbuildings, curtilage and vehicles. They observed an deteriorating fence in between the house and the truck, but nothing about this fence row put the officers on notice that it marked a property line, especially given that the Conrads frequently used this access to their home. There was also a large gap in the fence between the truck and the house. Most importantly, the closest home to where the truck was parked, other than the defendant's, was a quarter of a mile away. The officers in this case, therefore, were not negligent in executing their warrant and reasonably believed the truck was located on the property they were authorized to search. Their good faith obviates the application of the exclusionary rule to the evidence collected from the truck.

### B

The defendant also argues that the evidence of the firearms should be suppressed because weapons were not among the property or objects for which the warrant authorized the officers to search. Courts have consistently held that officers may seize evidence of criminal activity, even though it is not enumerated in a warrant, when that evidence is in plain view. *See, e.g., Mincey v. Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). The Supreme Court has defined three factors for courts to consider in determining the admissibility of evidence seized pursuant to the plain view doctrine. First, the officer must be lawfully in the place where he observed the evidence; that is, the search warrant must have allowed the officer to search where he views the evidence. *Horton v. California,* 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). In addition, the evidence must be in plain view and "its incriminating character must also be 'immediately apparent.'" *Id.* (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)); *see also United States v. Uzenski,* 434 F.3d 690, 707 (4th Cir.2006).

■ In this case, the officers were legally on the Conrad property conducting a search authorized by warrant. The search warrant authorized the officers to search for "blood, hair, tissue or other biological fluids," as well as "any burned clothing and cloth towels," pursuant to the officers' investigation of a murder. Evidence of this nature could be found in many places in the home and on the property, including on the defendant's bed and in a vehicle owned by Mr. Conrad, where the evidence Mrs. Conrad seeks to suppress was discovered. The officers were, therefore, lawfully in the location where they discovered the firearms and the evidence was lying in those places in plain view.

The defendant appears to contend that the "incriminating character" of the firearms was not "immediately apparent." *Horton,* 496 U.S. at 136, 110 S.Ct. 2301. The defendant points out that she had no prior felony convictions and, therefore, should have been allowed to legally possess firearms. This argument, however, runs into a number of barriers. First, the officers conducting the search at the defendant's home were investigating a homicide, and the means employed to commit that homicide had not yet been determined by the medical examiner at the time of the search. The officers, therefore, reasonably suspected and had probable cause to believe that the firearms might be evidence of the murder. Second, in the course of the search and before seizing the firearms, the officers had found evidence, including a smoking device with methamphetamine residue and marijuana, that

residents of the home had been using controlled substances. It would have been immediately apparent to the officers that the residents of the home were in possession of firearms while being unlawful users of controlled substances. *See* 18 U.S.C.A. § 922(g)(3); Va.Code Ann. § 18.2–308.4 (2012). Finally, the officers were aware that Mr. Conrad, a resident of the home, was a convicted felon. Their discovery of firearms in the home and at the property would have made it immediately apparent to them that Mr. Conrad may have been a felon unlawfully in possession of firearms. The incriminating nature of the weapons therefore was immediately apparent to the officers conducting the search, and they validly seized the weapons pursuant to the plain view exception to the warrant requirement. The defendant, therefore, is not entitled to suppression of the evidence against her based upon this argument.

## II

In addition to her motion to suppress, the defendant has filed a motion to dismiss Counts Two, Three and Four of the Indictment. She argues that the application of these statutes to her conduct violates her Second Amendment right to keep and bear arms.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court decided in *District of Columbia v. Heller* that the Second Amendment guaranteed an individual right to bear arms. 554 U.S. 570, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) ("There seems to us no doubt, on the basis of both text and history, that the Second Amend-

ment conferred an individual right to keep and bear arms."). The Court qualified its holding, however, noting that "the right secured by the Second Amendment is not unlimited." *Id.* at 626, 128 S.Ct. 2783. The Court enumerated a list of historical prohibitions of the possession of firearms as examples of regulations that the *Heller* decision should not be read to impugn.[2] *Id.* at 626–27, 128 S.Ct. 2783. However, it declined to discuss the level of scrutiny courts should apply in evaluating the constitutionality of firearm regulations, other than to note that a rational basis standard would be insufficient. *Id.* at 628 n. 27, 128 S.Ct. 2783.

Following the *Heller* decision, the Fourth Circuit prescribed a "two-part approach" for evaluating regulations under the Second Amendment. *United States v. Chester*, 628 F.3d 673, 680 (4th Cir.2010). First, the court must determine "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* (internal quotation marks and citation omitted). If the conduct was not understood to be within the scope of the right at the time of ratification, then the challenged law is valid. *Id.* If the challenged regulation burdens conduct that was within the historical scope of the Second Amendment, then the court must apply "an appropriate form of means-end scrutiny" in which the government bears the burden of demonstrating constitutional validity. *Id.*

## A

The Fourth Circuit applied this analysis to 18 U.S.C.A. § 922(g)(3), which prohibits possession of firearms by unlawful users of controlled substances, in *United States v.*

---

2. Among those regulations were "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller,* 554 U.S. at 626–27, 128 S.Ct. 2783.

*Carter*, 669 F.3d 411 (4th Cir.2012). For purposes of its analysis, the court assumed that possession of firearms by users of controlled substances was within the scope of the right protected by the Second Amendment. The Fourth Circuit then addressed the level of scrutiny applicable to regulations of firearms. It concluded that the right to self-defense is the sort of fundamental right meriting the protection of a strict scrutiny standard. *Id.* at 416. However, the court noted that this fundamental right is enjoyed only by "'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635, 128 S.Ct. 2783); *see also United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir.2010) ("[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'") (internal citations omitted). Carter, as a user of controlled and illegal substances, could not claim the status of being a law-abiding citizen and therefore did not enjoy the core right to bear arms in self-defense. The application of intermediate scrutiny was, therefore, the appropriate standard. *Carter*, 669 F.3d at 416–17. The government was required to show that it had an important governmental interest and that interest would be "substantially served by enforcement of the regulation." *Id.* at 417 (citing *Chester*, 628 F.3d at 683).

Although readily conceding that removing firearms from the hands of dangerous individuals is an important interest, the court concluded that the government could not rely on mere supposition in making its argument that there was a connection between the use of controlled substances and violence. *Id.* at 418. The Fourth Circuit remanded the case to the district court to allow the government to submit evidence to demonstrate that the regulation was tailored to substantially serve its important interest. On remand, the district court found the empirical evidence and the practical considerations propounded by the government to be persuasive in concluding that § 922(g)(3) was constitutional. *United States v. Carter*, No. 2:09–00055, 2012 WL 5935710 (S.D.W.Va. Nov. 27, 2012).

■ Like the district court in *Carter*, I begin my analysis of the constitutionality of § 922(g)(3) by noting, as the Fourth Circuit did in its *Carter* decision, that this section is more circumscribed than other subsections of § 922(g). Section 922(g)(3) prohibits the possession of a firearm only while a person is currently an unlawful user or addict. 669 F.3d at 419. The prohibition terminates when a person is no longer a user of drugs. This section is narrowly tailored not only because it is less permanently intrusive, but also because it tracks and responds to an individual's future behavioral decisions. *Id.*

Second, I consider the government's scientific and empirical evidence, almost all of which was presented to the district court on remand in the *Carter* case, regarding the nexus between controlled substances and crime. The district court in *Carter* reached the conclusion that the government's evidence demonstrated not only a connection between drug use and crime but also specifically between drug use and violent crime. 2012 WL 5935710 at *4–6. I concur with this conclusion and find compelling the nine scientific studies that the government introduced at the hearing on the present motion. *See, e.g.* Carrie B. Oser et al., *The Drugs—Violence Nexus Among Rural Felony Probationers*, 24 J. Interpersonal Violence 1285, 1294 (2009) ("Regarding the use of illicit drugs, participants who had ever used cocaine/crack ... or any other stimulants such as methamphetamines ... were significantly more likely to have ever committed a violent offense."); H. Virginia McCoy et al., *Perpetrators, Victims, and Observers of*

*Violence: Chronic and Non–Chronic Drug Users,* 16 J. Interpersonal Violence 890, 903 (2001) ("[Chronic drug users] in this sample of out-of-treatment drug users were nine times more likely ... to have ever robbed someone, almost five times more likely ... to have .ever shot someone, and more than twice ·as likely to have perpetrated all other violent acts, when controlling for. other factors.").

In its *Carter* decision, the Fourth Circuit listed a number of more practical provides substantial support to its important interest. Illicit drug users are more likely to lose self-control, threatening the safety of others, especially police officers who are likely to come into contact with them. 669 F.3d at 420. Illicit drug users will also encounter drug dealers, raising an additional specter of danger. The financial burden of drug dependency can also drive users to commit burglaries and robberies, which are only made more dangerous by firearms. *Id.*

I believe that the government has presented adequate evidence in this case to establish the constitutionality of § 922(g)(3), especially given that "intermediate scrutiny has never been held to require a perfect end-means fit." *United States v. Mahin,* 668 F.3d 119, 127–28 (4th Cir.2012). The scope of this section is limited, creating only a temporal prohibition. The government has demonstrated a nexus between violence and consumption of controlled substances. ˙ The common-sense considerations the statute serves are clear and tailored to the important interest of protecting the community. I also note that no appellate court has to date found § 922(g)(3) to be unconstitutional. *See, e.g., United States v. Dugan,* 657 F.3d 998, 999 (9th Cir.2011); *United States v. Seay,* 620 F.3d 919, 925 (8th Cir.2010); *Yancey,* 621 F.3d at 686.

■ The defendant has argued that the immediacy of her particular interest in possessing a firearm warranted a higher level of scrutiny for the application of this statute to her conduct. She points out that her husband had recently been stabbed by a gang member and she had been warned by law enforcement that the gang could return. She contends that her legitimate fear places her possession of a firearm squarely in the core right to self-defense *Heller* found the Second Amendment to have codified. The Second Amendment, however, is not concerned with the legitimacy of a person's fear. "The weight of the right to keep and bear arms depends not only on the purpose for which it is exercised but also on relevant characteristics of the person invoking the right." *Carter,* 669 F.3d at 415. As explicated above, an individual's status as a user of illegal drugs would remove him or her from the core right defined in *Heller,* necessitating the application of only intermediate scrutiny.

The defendant has also argued that applying this statute to her under intermediate scrutiny is unconstitutional because she has not yet been shown to be a user of illegal drugs, nor does she have any prior convictions for this behavior. The defendant ·effectively argues that she is entitled to the protection of strict scrutiny, and dismissal of the Indictment against her, until the government has proven she is a drug user. This is, however, precisely what the government will be required to prove at trial in order to convict her. Therefore, I do not find that this argument raises genuine issues of constitutional concern.

**B**

The defendant has also moved to dismiss Count Three of the Indictment,· which charges her with knowingly disposing of firearms to a person whom she had reason to believe had been convicted of a felony,

was an unlawful user of a controlled substance, had been adjudicated a mental defective and had been committed to a mental institution, in violation of 18 U.S.C.A. § 922(d). She argues that this section also violates her rights under the Second Amendment.

The Fourth Circuit recently addressed this argument:

> [The defendant] has not pointed this court to any authority, and we have found none, that remotely suggests that, at the time of its ratification, the Second Amendment was understood to protect an individual's right to *sell* a firearm. Indeed, although the Second Amendment protects an individual's right to bear arms, it does not necessarily give rise to a corresponding right to sell a firearm.... Accordingly, [the defendant's] argument that § 922(d)(3) is unconstitutional under *Heller* must be rejected.

*United States v. Chafin,* 423 Fed.Appx. 342, 344 (4th Cir.2011) (unpublished).

■ In this case, the defendant is not accused of actually selling a firearm, but the distinction is immaterial. An individual's decision to give or sell a firearm to another person does not directly bear on the individual's capacity to possess firearms in her own right. I find the Fourth Circuit's observations in *Chafin* persuasive. The defendant, therefore, is not entitled to a dismissal of Count Three.

### C

Finally, the defendant has moved to dismiss Count Four of the Indictment, which charges her with knowingly making a false statement on an ATF form in connection with the acquisition of a firearm from a licensed dealer in violation of 18 U.S.C.A. § 922(a)(6). Specifically, the Indictment alleges that the defendant falsely stated on ATF Form 4473 that she was not an unlawful user of controlled substances, while knowing that she was a user of methamphetamine and Xanax®.

■ I find that the defendant's arguments under this statute are subject to the same analysis that I have applied to the charge in Count Two. The regulation imposed by § 922(a)(6) is even narrower in scope than that imposed by § 922(g)(3). The section does not prohibit possession of a firearm at all; it merely asks that a person seeking to purchase a firearm not lie in the process of doing so. Moreover, the Supreme Court has indicated its approval of precisely the type of regulation imposed by § 922(a)(6). *See McDonald v. City of Chicago, Ill.,* — U.S. ——, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010) (emphasizing that "longstanding regulatory measures" such as "'laws imposing conditions and qualifications on the commercial sale of arms'" are presumptively constitutional) (quoting *Heller,* 554 U.S. at 626–27, 128 S.Ct. 2783). For the reasons outlined above, I find that § 922(a)(6) is constitutional under the Second Amendment because it substantially serves an important government interest in preventing dangerous persons from obtaining firearms.

### III

For the foregoing reasons, it is hereby **ORDERED** that the defendant's Motion to Suppress the Admission of Firearms into Evidence (ECF No. 73) and Motion to Dismiss Indictment on Constitutional Grounds (ECF No. 69) are DENIED.